UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TONY TANG and GILBERTO TORRES, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | 1:23-CV-09885-LTS |

OPINION AND ORDER

SUSMAN GODFREY LLP
By: Beatrice Catherine Franklin
Joseph Zachary Fields
Geng Chen
One Manhattan West
Ste 50th Fl.
New York, NY 10001

-and-

SUSMAN GODFREY LLP
By: Dinis Cheian
401 Union Street
Suite 3000
Seattle, WA 98101

*Attorneys for Plaintiffs Tony Tang and Gilberto Torres Gomez on behalf of themselves and all others similarly situated*

OFFICE OF THE U.S. ATTORNEY for the Southern District of N.Y.
By: Alyssa O'Gallagher
Jessica F. Rosenbaum
86 Chambers St
New York, NY 10007

*Attorneys for Defendant United States of America*

LAURA TAYLOR SWAIN, CHIEF UNITED STATES DISTRICT JUDGE

Plaintiffs Tony Tang and Gilberto Torres ("Plaintiffs") bring a three-count putative class action complaint against Defendant United States of America ("Defendant") under the Little Tucker Act, 28 U.S.C. section 1346(a)(2),[1] asserting claims for refunds of "illegal exactions"[2] in connection with the biometric service fee that United States Citizenship and Immigration Services ("USCIS") charged to applicants for certain immigration-related services. (Docket entry no. 1 ("Compl.") ¶¶ 57-80.) In Count One, Plaintiffs allege that the $85 biometric fee charged by USCIS from November 8, 2017 to March 31, 2024[3] was an "illegal exaction" in violation of 8 U.S.C. section 1356(m). (Id. ¶¶ 70-74.) In Count Two, Plaintiffs allege that the $85 biometric fee was an "illegal exaction" in violation of 8 C.F.R. section 103.7(b)(1)(i)(C),[4]

1 The Little Tucker Act vests concurrent subject matter jurisdiction in the district courts and the United States Court of Federal Claims for "civil action[s] or claim[s] against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department . . . ." 28 U.S.C. § 1346(a)(2). For claims exceeding $10,000, the Big Tucker Act vests exclusive jurisdiction in the Court of Federal Claims. 28 U.S.C. § 1491(a)(1).

2 An "illegal exaction" claim is a "claim that money was 'improperly paid, exacted, or taken from the claimant' in violation of law." Nat'l Veterans Legal Servs. Program v. United States, 968 F.3d 1340, 1345 (Fed. Cir. 2020) (quoting Norman v. United States, 429 F.3d 1081, 1095 (Fed. Cir. 2005)). To bring such a claim, "the plaintiff must identify a statute, or other source of federal law, entitling her to receive money from the government." Id. at 1347. Here, the alleged sources are 8 U.S.C. section 1356(m) and 8 C.F.R. section 103.7(b)(1)(i)(C). (Compl. ¶¶ 70-81.)

3 Plaintiffs bring purported class actions on behalf of "[a]ll individuals and entities who have paid the $85 biometric fee in the past six years" since the Complaint was filed on November 8, 2023. (Compl. ¶ 58.) As explained infra p. 7, the relevant USCIS regulation was in effect from December 23, 2016 to March 31, 2024.

4 Plaintiffs challenge the version of the regulation that was in effect from December 23, 2016 to March 31, 2024. Infra p. 7. Section 103.7 has since been amended.

wherein USCIS charged applicants the fee but did not re-collect biometrics. (Id. ¶¶ 75-78.) In Count Three, Plaintiffs allege that the $85 biometric fee was an "illegal exaction" in violation of 8 C.F.R. section 103.7(b)(1)(i)(C), wherein USCIS charged applicants the fee but did not order a new FBI background check. (Id. ¶¶ 79-81.)

This Opinion and Order addresses Defendant's motion seeking dismissal of the complaint under Rule 12(b)(1) for lack of subject matter jurisdiction, dismissal of the complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, and judgment on the pleadings under Rule 12(c). (Docket entry no. 42.) The Court has considered carefully the parties' submissions[5] (docket entry no. 43 ("Def. Mem."); docket entry no. 56 ("Pls. Mem."); docket entry no. 65 ("Def. Reply"); docket entry no. 89 ("Def. Supp."); docket entry no. 90 ("Pls. Supp.")),[6] and, for the reasons set forth below, Defendant's motion to dismiss the complaint is granted for lack of subject matter jurisdiction.

## I. BACKGROUND

Unless otherwise noted, the following recitation is drawn from the Complaint, the well-pleaded factual allegations of which are taken as true for the purposes of this motion practice.[7]

---

[5] Public Counsel, Immigrant Defenders Law Center, The Legal Aid Society, and Central American Legal Assistance moved for leave to file an amici curiae brief in support of Plaintiffs' position. (Docket entry no. 59.) Because the proposed amici curiae brief does not address subject matter jurisdiction, amici curiae's motion is denied as moot.

[6] Pincites to materials on the docket refer ECF-designated page numbers.

[7] The Court recites facts from—and is entitled to rely on—certain materials outside the Complaint. First, the Court recites the legislative history of USCIS's fee-setting authority. See Goe v. Zucker, 43 F.4th 19, 29 (2d Cir. 2022) ("[A]s a fundamental matter, courts may take judicial notice of legislative history." (citing Territory of Alaska

A. USCIS's Fee-Setting Authority

Prior to 1988, USCIS's predecessor agency, United States Immigration and Naturalization Services ("INS"),[8] collected a variety of fees for processing and adjudicating immigration and naturalization applications pursuant to regulations that it promulgated under the Independent Offices Appropriations Act of 1952 ("IOAA"). See Ayuda Inc. v. Att'y Gen., 848 F.2d 1297, 1298-1300 (D.C. Cir. 1988) (describing INS's authority under the IOAA); Barahona v. Napolitano, No. 10-CV-1574-SAS, 2011 WL 4840716, at *2 (S.D.N.Y. Oct. 11, 2011) (same). The IOAA permitted federal agencies to collect user fees for "a service or thing of value provided by the agency." 31 U.S.C. § 9701(b) (originally codified at 31 U.S.C. § 483a). The IOAA, as interpreted by the Supreme Court, provides that "a reasonable charge 'should be made to each identifiable recipient for a measurable unit or amount of Government service or property from which he derives a special benefit,'" but "no charge should be made for services rendered, 'when the identification of the ultimate beneficiary is obscure and the service can be primarily considered as benefitting broadly the general public.'" Fed. Power Comm'n v. New England Power Co., 415 U.S. 345, 349-50 (1974) (citation omitted). This was a strict "cost-for-services-

---

v. Am. Can Co., 358 U.S. 224, 226-27 (1959))). Second, the Court references the Amended Declaration of Jay R. Weselmann (docket entry no. 89-1 ("Am. Weselmann Decl.")) and the Declaration of Jay R. Weselmann (docket entry no. 44 ("Weselmann Decl.")) for background on the Plaintiffs' paths to citizenship, which is relevant to the issue of subject matter jurisdiction. See Luckett v. Bure, 290 F.3d 493, 496-97 (2d Cir. 2002) ("In resolving the question of [subject matter] jurisdiction, the district court can refer to evidence outside the pleadings and the plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."). Plaintiffs do not dispute any of the facts proffered by the Amended Weselmann Declaration or the Weselmann Declaration. (See Pls. Mem. at 22-25.)

8 The INS was dissolved on March 1, 2003, and its immigration and naturalization duties were given to the newly-formed USCIS. See Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135.

rendered" requirement. Barahona, 2011 WL 4840716, at *3. The fees that the INS collected pursuant to the IOAA "were treated as miscellaneous receipts of the United States Treasury and deposited in the General Fund."[9] U.S. Citizenship and Immigration Services Fee Schedule, 75 Fed. Reg. 58962, 58966 (Sept. 24, 2010). "Those fees were not available to the Immigration and Naturalization Service for expenditure." Id. Instead, "all activities related to case processing were funded by appropriations" from Congress. Id.

In 1988, Congress created the Immigration Examinations Fee Account ("IEFA"). Pub. L. No. 100-459, § 209(a), 102 Stat. 2186, 2203 (1988). Among other things, the IEFA added subsection (m) to 8 U.S.C. section 1356. Since the enactment of the IEFA, USCIS has traced its fee-setting authority to section 1356(m) and the IEFA rather than the IOAA. Barahona, 2011 WL 4840716, at *3 (collecting USCIS regulations). As USCIS states, the IEFA was intended to be an "exception to the limitations of" and "broader than" the IOAA. 75 Fed. Reg. at 58966. USCIS also explains that "the IEFA was created to provide an alternative to appropriations." Id. Congress may still provide appropriations, which it does for "specific USCIS programs." Id. "In the absence of appropriations, however, USCIS's only funding source is fee revenue," which USCIS is authorized to collect under section 1356(m). Id.

In 1990, Congress amended section 1356(m). Act of Nov. 5, 1990, Pub. L. No. 101-515, § 210(d), 104 Stat. 2101, 2121. This amended version was in effect from December

---

9 The General Fund "consists of assets and liabilities used to finance the daily and long-term operations of the U.S. Government as a whole. It also includes accounts used in management of the budget of the U.S. Government." The General Fund, Bureau of the Fiscal Serv., (last updated Mar. 25, 2026) https://perma.cc/PQ3L-EQN3.

23, 2016, to March 31, 2024, when the challenged biometric fee was operative, and it remains in effect today. The statute provides:

> (m) Immigration Examinations Fee Account
>
> Notwithstanding any other provisions of law, all adjudication fees as are designated by the Attorney General in regulations shall be deposited as offsetting receipts into a separate account entitled "Immigration Examinations Fee Account" in the Treasury of the United States, whether collected directly by the Attorney General or through clerks of courts: . . . *Provided further*, That fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected.

8 U.S.C.A. § 1356(m) (Westlaw through P.L. 119-102).

B. USCIS's Biometric Services Fee

Certain immigration and naturalization applications—such as an application for permanent residence ("green card"), an application to renew a green card, and an application for naturalization—require payment of a fee for "biometric services," separate and apart from the fee for the application itself. (Compl. ¶ 6.) The biometric fee is charged along with the application fee. (Id.) USCIS has explained that the biometric fee covers four costs: (1) "FBI Name Checks"; (2) "FBI fingerprints"; (3) "Application Support Center (ASC) contractual support"; and (4) "Biometric service management overall, including federal employees at the ASC locations." (Id. ¶ 7.)

USCIS set the biometric fee at $80 in 2007. See Adjustment of the Immigration and Naturalization Benefit Application and Petition Fee Schedule, 72 Fed. Reg. 29851, 29852 (May 30, 2007) (effective July 30, 2007); U.S. Citizenship and Immigration Services Fee Schedule, 75 Fed. Reg. 58962, 58963 (Sept. 24, 2010) (effective Nov. 23, 2010). From

November 23, 2010 to December 22, 2016, USCIS set the biometric fee at $85. See U.S. Citizenship and Immigration Services Fee Schedule, 81 Fed. Reg. 73292, 73292 (Oct. 24, 2016) (effective Dec. 23, 2016). From December 23, 2016 to March 31, 2024, USCIS maintained the biometric fee at $85. (Compl. ¶ 21 & n.24); U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 89 Fed. Reg. 6194, 6194 (Jan. 31, 2024) (effective Apr. 1, 2024). Plaintiffs challenge the $85 biometric fee that was in effect from December 23, 2016, to March 31, 2024, and specifically seek to bring claims starting from November 8, 2017. (Pls. Mem. at 16-17; Compl. ¶ 58.) During that time period, the pertinent provisions of the relevant USCIS regulation read:

> (b) Amounts of fees—
>
> (1) Established fees and charges— . . .
>
> (C) Biometric services fee. For capturing, storing, and using biometric information (Biometric Fee). A service fee of $85 will be charged to pay for background checks and have their biometric information captured, stored, and used for any individual who is required to submit biometric information for an application, petition, or other request for certain immigration and naturalization benefits (other than asylum or refugee status) or actions. USCIS will not charge a biometric services fee when: [an applicant submits various types of applications].

8 C.F.R. § 103.7(b)(1)(i)(C) (effective Dec. 23, 2016) (amended Apr. 1, 2024).

C. USCIS's Reuse of Biometrics and Background Checks

The first time an immigrant submits an application to USCIS that requires payment of the $85 biometric fee, the immigrant goes an Application Support Center ("ASC") to have their biometric information (i.e., fingerprints, photo, and signature) collected. (Compl. ¶ 8 & n.8.) USCIS then submits that biometric information to the FBI for a fingerprints check. (Id.) USCIS also submits the applicant's name to the FBI for an FBI name check. (Id.) The FBI

fingerprints check and the FBI name check form part of the "full criminal background check." (Id.)

USCIS has a policy and practice of reusing previously collected biometrics and so, once USCIS receives an applicant's biometrics, it often does not re-collect biometrics when the applicant files another qualifying application, although the applicant pays another $85. (Id. ¶ 11.) This policy is intended to increase efficiency and reduce backlog and delays. (Id.) USCIS began this practice no later than March 2016, and it reuses around 1.9 million biometric sets every year. (Id.)

In addition to reusing biometric information, USCIS also reuses the results of fingerprints checks and name checks. (Id. ¶ 13.) Under USCIS policy, FBI fingerprints checks and FBI name checks remain valid for 15 months. (Id. ¶ 15.) Accordingly, USCIS often does not run a new fingerprints check or a new name check if the applicant's prior, successful checks occurred within the past 15 months. (Id.)

If USCIS reuses an applicant's previously collected biometrics, USCIS will send a "Biometric Reuse Notice" to the applicant. (Id. ¶ 14.) The Notice "informs [the applicant] that USCIS is able to reuse your previously captured fingerprints and other biometrics . . . [and] it is not necessary for you to appear at a USCIS Application Support Center (ASC) for a biometrics appointment." (Id. (emphasis omitted).) The Notice also states that "USCIS will run the same security checks and use your biometric data as in the past," referring to USCIS's policy of reusing background and name checks if, in the preceding 15 months, the applicant had a prior,

successful background and name check. (Id. ¶ 15.) The Biometric Reuse Notice also notifies the applicant that the $85 biometric fee "will not be refunded." (Id. ¶ 14.)

D. Plaintiffs' USCIS Applications

Both Plaintiffs paid multiple biometric service fees on their paths to citizenship. (Id. ¶ 16.) Each also received at least one Biometric Reuse Notice, indicating that USCIS had re-used their biometrics. (Id.) Plaintiffs also allege that USCIS did not order new name checks or new fingerprints checks and instead reused previously performed name checks and fingerprints checks when they made new applications, although Plaintiffs paid the full $85 fee with each of their applications.[10] (Id. ¶¶ 16-18.) On Plaintiff Tang's path to becoming a U.S. citizen, he paid a total of two biometric services fees—one in October 2016[11] and one in December 2021. (Am. Weselmann Decl. ¶¶ 5, 11.) Likewise, on Plaintiff Torres Gomez's path to becoming a U.S. citizen, he paid a total of three biometric services fees—one in January 2012[12] and two in April 2022. (Id. ¶¶ 18, 21, 23.)

E. USCIS's Fee-Setting Process: Cost-per-applicant Plus Cost Reallocation

Under the Chief Financial Officer Act ("CFO Act"), 31 U.S.C. section 501 et seq., USCIS "is required by law to review its fees at least once every two years." (Compl. ¶ 20 (quoting 72 Fed. Reg. at 29856).) According to USCIS, "[t]he fees are designed to recover the costs of operations in the future and are not retroactive." (Id. (quoting 72 Fed. Reg. at 29870).)

---

10 The Amended Weselmann Declaration asserts that USCIS did not reuse name checks or fingerprint checks for either Plaintiff Tang or Torres Gomez. (See Pls. Mem. at 22-25; Weselmann Decl. ¶¶ 7, 9, 12, 19, 22, 24; Am. Weselmann Decl. ¶¶ 7, 9, 12, 19, 22, 24.)

11 Plaintiffs do not challenge the fees collected prior to November 8, 2017. Supra p. 7.

12 Plaintiffs do not challenge the fees collected prior to November 8, 2017. Supra p. 7.

USCIS expressly represents that the fees are "not intended to recover the losses currently being sustained by USCIS." (Id. (quoting 72 Fed. Reg. at 29870).)

USCIS follows a three-step process in setting its fees, including the biometric services fee: (1) application of the activity-based costing ("ABC") model; (2) cost reallocation for unpaid services; and (3) cost reallocation for policy reasons. (Id. ¶¶ 22-36.) At step one, USCIS calculates the cost-per-applicant of each immigration benefit request processed by USCIS, including the biometric services benefit request. (Id. ¶¶ 23-29.) At steps two and three, USCIS adjusts the cost-per-applicant, reallocating costs for unpaid services and for policy reasons. (Id. ¶¶ 30-36.) The below table summarizes the three steps in USCIS's fee-setting process. The "Model Output" column refers to the cost-per-applicant calculated in step one: $75. (Id. ¶ 34.) The "Cost Reallocation" column refers to the cost-per-applicant reallocation calculated in steps two and three: $0. (Id.) Thus, for the biometric services benefit request, the three-step process resulted in the sum of the "Model Output" ($75) and the "Cost Reallocation" ($0); that sum was $75. (Id. ¶¶ 37-39.)

**Final Fees by Immigration Benefit Request**

| Immigration Benefit Request | Current Fees | Model Output[49] | Cost Reallocation[50] | Final Fees[51] | Change in Fees | Percent Change in Fees |
|---|---|---|---|---|---|---|
| N-470 Application to Preserve Residence for Naturalization Purposes | $330 | $792 | ($438) | $355 | $25 | 8% |
| N-565 Application for Replacement Naturalization/Citizenship Document | $345 | $399 | $157 | $555 | $210 | 61% |
| N-600/N-600K Application for Certificate of Citizenship | $600 | $841 | $330 | $1,170 | $570 | 95% |
| Waiver Forms (I-191, I-192, I-193, I-212, I-601, I-612) | $585 | $667 | $262 | $930[53] | $345 | 59% |
| USCIS Immigrant Fee (formerly called the "Immigrant Visa DHS Domestic Processing Fee") | $165 | $157 | $61 | $220 | $55 | 33% |
| Biometric Services | $85 | $75 | $0 | $85[54] | $0 | 0% |

When USCIS set fees in 2016, it set the fee for each type of benefit request equal to the value generated by the three-step process (i.e., cost-per-applicant of that request plus cost reallocation)—except for the challenged biometric services fee (and one other, rarely imposed

fee[13]). (Id. ¶¶ 39-40.) In 2016, USCIS determined that the biometric services benefit request cost $75 per applicant and did not reallocate any other costs to that service, but it nonetheless set the fee at $85. (Id.)

The way USCIS set the 2016 biometric fee was also contrary to its past practices. (Id. ¶ 39.) Previously, in 2010 and 2007, USCIS set almost every single fee—including the biometric services fee—at the cost-per-applicant plus cost reallocation, as calculated by the three-step process. (Id. ¶ 40.) There was only one exception in 2010 and 2007.[14] (Id.)

In other words, except for the biometric services challenged fee here, USCIS has almost always followed its three-step process, setting the final fee equal to the calculated cost-per-applicant plus any specified cost reallocation. (Id. ¶¶ 39-40.) In its 2016 rulemaking, USCIS explained its reasoning for departing from its usual practice when it set the challenged biometric services fee as follows:

> While the model calculated a biometric services fee of $75, DHS [Department of Homeland Security, which is the parent agency of USCIS] believes that the importance of and uncertainty in the biometric services area justifies holding that fee at $85. . . . Over the next few fiscal years the volume of requests for biometrics services, as well as the costs associated with those services, such as fees paid to the FBI for fingerprints and name checks, are uncertain. Therefore, a moderate amount above current full cost recovery calculation is justified to shield USCIS from that uncertainty. In addition, DHS proposes to use its discretion in setting this fee to hedge against potential rising programmatic costs which USCIS cannot foresee or control. For example, new regulatory or statutory

---

13 In addition to the biometric services fee, the other exception was the I-829 Petition by Entrepreneur to Remove Conditions fee. USCIS charges that fee very rarely (only 3,562 times a year compared to 3,028,254 times for the biometric fee), and USCIS stated that it deviated from its practice for the I-829 "because the final parameters of the program are still evolving." (Compl. ¶ 39 n.54 (quoting 2016 IEFA Review at 24-25).)

14 In 2010, the only exception was the I-907 premium processing fee that USCIS adjusted based on the Consumer Price Index as mandated by 8 U.S.C. section 1356(u)(3)(C). (Compl. ¶ 40 n.55.) In 2007, there were no exceptions. (Id. ¶ 40.)

> background check requirements may be borne out of increased national security concerns dictated by events or changing circumstances.

U.S. Citizenship and Immigration Services Fee Schedule, 81 Fed. Reg. 26904, 26917 (May 4, 2016); (see also Compl. ¶ 37 n.51).

F. USCIS's Failure to Consider Reuse in Calculating Cost-per-applicant

Plaintiffs further argue that even the $75 cost-per-applicant calculated by USCIS in step one was inflated because USCIS did not consider that the cost of performing biometric services is lower when USCIS reused biometrics and FBI background checks, the latter of which include both fingerprints checks and name checks. (Compl. ¶ 43.) "In 2007, the costs of collecting biometrics and running background checks corresponded to 49.7% and 36.2%, respectively, of the total cost for performing biometric services." (Id.) Assuming those proportions apply to the challenged 2016 rule, when USCIS charged the full $85 biometric fee but did not collect biometrics, the agency pocketed about 50% of the $85 fee as "profit." (Id.) When USCIS charged the full $85 biometric fee but does not run new background checks, it pocketed about 64% of the $85 fee as "profit." (Id.) And, when USCIS charged the full $85 biometric fee but neither collected biometrics nor ran new background checks, it pocketed about 86% of the $85 fee as "profit." (Id.) USCIS reused around 1.9 million biometrics per year and "some number" of background checks. (Id.) Per Plaintiffs' calculations, each of those 1.9 million reuses likely yielded USCIS a "profit" of at least 50% of the $85 fee, and many of them likely yielded an even higher "profit" of almost 86%. (Id.)

USCIS has confirmed that it did not account for reuse of biometrics or background checks when it set the biometric services fee that was in effect from December 23, 2016 to March 31, 2024. (Id. ¶¶ 44-47.) In 2020, USCIS created a rule that would account for reuse (id. ¶ 48), but the rule was enjoined by two federal district courts before it could take

effect. See Immigrant Legal Res. Ctr. v. Wolf, 491 F. Supp. 3d 520, 526 (N.D. Cal. 2020); Nw. Immigrant Rts. Proj. v. USCIS, 496 F. Supp. 3d 31, 41 (D.D.C. 2020). In a rule that took effect on April 1, 2024, USCIS adopted a similar approach that accounted for reuse of biometric information when setting biometric fees. (Compl. ¶ 49.) In the rulemaking process for both the 2020 and 2024 rules, USCIS estimated that, when taking reuse into account, the cost-per-applicant would be about $55. (Id. ¶¶ 50-51.) Thus, according to Plaintiffs, "[t]he biometric-related costs disclosed by USCIS in its 2020 and [2024] rulemakings reveal that the biometric fee [ ] charged by USCIS [from 2016 to 2024] should be closer to $55, not $85." (Id. ¶ 50.) The portions of the 2024 rule that pertain to the biometric services fee are currently in effect.

G. Plaintiffs' Statutory Claim

Plaintiffs claim USCIS violated 8 U.S.C. section 1356(m) when it set the biometric services fee at $85 in 2016. (Id. ¶¶ 70-74.) To assert this claim, Plaintiffs seek the certification of a class of "[a]ll individuals and entities who have paid the $85 biometric fee in the past six years." (Id. ¶ 58.) Plaintiffs contend that "[t]hese biometric fees exceeded the amount that USCIS can lawfully charge under 8 U.S.C. § 1356(m) or any other statutory authority because the $85 fee was set much higher than the level that would 'ensure recovery of the full costs of providing all [USCIS] services' that USCIS itself allocates to the biometric fee." (Id. ¶ 73 (quoting 8 U.S.C. § 1356(m).) Plaintiffs allege that "USCIS confessed that it spends only $75 per applicant to process biometrics" and that even the $75 number "overstated the agency's actual costs because the analysis that USCIS undertook to arrive at a cost of $75 per application did not take into account the millions of applications for which USCIS did not actually provide some or all of the biometric services associated with the fee." (Id. at 3.)

Plaintiffs allege that "approximately $55 would be sufficient to recover the correlated costs actually incurred by USCIS." (Id.)

This alleged statutory violation, according to Plaintiffs, was an "illegal exaction" by USCIS that is actionable under the Little Tucker Act, 28 U.S.C. section 1346(a)(2). (Id. ¶ 71.) As a remedy, Plaintiffs seek "the return of the $85 biometric fees that USCIS charged in contravention of its statutory authority." (Id. ¶ 74.)

H. Plaintiffs' Regulatory Claims

Plaintiffs also claim that USCIS violated 8 C.F.R. section 103.7(b)(1)(i)(C) when it set the biometric services fee at $85 in 2016. (Id. ¶¶ 75-81.) To assert this claim, Plaintiffs seek the certification of two plaintiff classes: "[a]ll individuals and entities who have paid the $85 biometric fee in the past six years and for whom USCIS did not collect biometrics"; and "[a]ll individuals and entities who have paid the $85 biometric fee in the past six years and for whom USCIS did not order an FBI background check." (Id. ¶ 58.)

Plaintiffs interpret the term "and" in section 103.7(b)(1)(i)(C) to be conjunctive.[15] (Pls. Mem. at 38.) Thus, Plaintiffs contend, USCIS must perform all four services (background check, biometric capture, biometric storage, and biometric use) when it charges the biometric services fee. (See Compl. at 3-4, ¶¶ 51-56.) Plaintiffs allege that "USCIS violates its own implementing regulation for biometric fees [section 103.7(b)(1)(i)(C)] when it charges applicants

15 8 C.F.R. § 103.7(b)(1)(i)(C) reads: "A service fee of $85 will be charged to pay for background checks and have their biometric information captured, stored, and used for any individual who is required to submit biometric information for an application, petition, or other request for certain immigration and naturalization benefits (other than asylum or refugee status) or actions." (emphasis added).

the $85 biometrics fee without re-collecting biometrics or performing new FBI background checks." (Id. ¶ 51.)

This alleged regulatory violation, according to Plaintiffs, was an "illegal exaction" by USCIS that is actionable under the Little Tucker Act, 28 U.S.C. section 1346(a)(2). (Id. ¶¶ 77, 80.) As a remedy, Plaintiffs seek "the return of the $85 biometric fees that USCIS charged in contravention of its regulatory authority." (Id. ¶¶ 78, 81.)

## II. Discussion

Defendant's motion seeks dismissal of the Complaint on three grounds: dismissal under Federal Rule of Civil Procedure Rule 12(b)(1) for lack of subject matter jurisdiction, dismissal under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, and judgment on the pleadings pursuant to Rule 12(c). Because subject matter jurisdiction is a threshold issue, the Court considers that aspect of Defendant's motion first. See Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990). And because the Court finds that it lacks subject matter jurisdiction of this action, the Court need not address the other bases on which Defendant seeks dismissal.

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Luckett v. Bure, 290 F.3d 493, 496 (2d Cir. 2002) (quoting Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)). "In resolving the question of jurisdiction, the district court can refer to evidence outside the pleadings and the plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Id. at 496-97.

As noted above, Plaintiffs bring their putative class action under the Little Tucker Act, which waives sovereign immunity for certain money-damages claims of less than $10,000

against the federal government, including those claims "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department." 28 U.S.C. § 1346(a)(2); see United States v. Bormes, 568 U.S. 6, 10 (2012). Where, as here, a class action is brought, the Little Tucker Act only requires that "the 'claims of individual members of the clas[s] do not exceed $10,000.'" Bormes, 568 U.S. at 10 n.1 (quoting United States v. Will, 449 U.S. 200, 211 n.10 (1980)). That criterion is plausibly met here.

Congress has, however, stripped courts of jurisdiction to review various actions that involve the exercise of discretion by the Secretary of Homeland Security, who leads the Department of Homeland Security, USCIS's parent agency. 8 U.S.C. section 1252(a)(2)(B)(ii) provides that "[n]otwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to review . . . any other decision or action of . . . the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of . . . the Secretary of Homeland Security . . . ." The parties dispute whether 8 U.S.C. section 1356(m), the fee-setting provision that is relevant to Plaintiffs' claims, specifies that the decision to set the biometric services fee is in the discretion of the Secretary of Homeland Security, and, consequently, whether section 1356(m) triggers the jurisdictional bar of section 1252(a)(2)(B)(ii). After careful review of the parties' submissions and the statutory language of section 1356(m), the Court holds that section 1356(m) vests USCIS[16] with discretion and thus

16 As a technicality, the inquiry under section 1252(a)(2)(B)(ii) is whether the Secretary of Homeland Security—who oversees USCIS—is vested with discretion under section 1356(m). For simplicity, however, the Court refers to USCIS.

The Court also notes that section 1356(m) refers to the "Attorney General" in connection with the setting and receipt of the relevant fees. This anachronism does not affect the Court's determinations here, because INS, which was part of the Department of Justice, has been dissolved and its responsibilities subsumed by the Department of Homeland

triggers section 1252(a)(2)(B)(ii)'s bar of judicial review. Because this Court lacks subject matter jurisdiction of Plaintiffs' claims, the Court need not address any of Defendant's other arguments and declines to grant the motion of the amici.

A. Section 1252(a)(2)(B)(ii) Strips the Court of Subject Matter Jurisdiction

Section 1252(a)(2)(B)(ii) precludes federal court review of USCIS actions "when a specified statute itself commits a particular decision to the discretion" of USCIS. Ruiz v. Mukasey, 552 F.3d 269, 274-75 (2d Cir. 2009). In determining whether the jurisdiction-stripping provision of section 1252(a)(2)(B)(ii) applies, "[t]he question is not whether [USCIS's decision] require[s] an exercise of discretion." Nethagani v. Mukasey, 532 F.3d 150, 154 (2d Cir. 2008). Rather, the question is whether the authorizing statute "'specifie[s]' that the 'decision' is 'in the discretion of [USCIS].'" Id. (quoting section 1252(a)(2)(B)(ii)). The parties dispute whether 8 U.S.C. section 1356(m) triggers section 1252(a)(2)(B)(ii). Section 1356(m) provides in pertinent part that

> fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected.

8 U.S.C. § 1356(m). For the reasons set forth below, the Court holds that 8 U.S.C. section 1356(m) vests USCIS with discretion in setting the biometric services fee, such that section 1252(a)(2)(B)(ii) strips this Court of jurisdiction.

---

Security. Regulatory authority under section 1365(m) was transferred to the Secretary of Homeland Security on March 1, 2003. See Chamber of Com. of United States v. United States Dep't of Homeland Sec., 815 F. Supp. 3d 73, 104 n.10 (D.D.C. 2025).

The Supreme Court has "repeatedly observed," that "the word 'may' clearly connotes discretion." Bouarfa v. Mayorkas, 604 U.S. 6, 13 (2024) (quoting Biden v. Texas, 597 U.S. 785, 802 (2022)) (internal quotations omitted). Section 1356(m) uses "may" and thus vests USCIS with discretion regarding the components of the fees in question. The statute provides that such fees "may be set at a level that will ensure recovery of the full costs of providing all such services" and that fees "may also be set at a level that will recover any additional costs associated with the administration of the fees collected." 8 U.S.C. § 1356(m) (emphases added). USCIS may choose to set fees at a level that does not ensure recovery of the full costs. USCIS may also choose not to recover additional costs associated with administration. And the statute does not constrain fees with respect to either reference point. The discretionary language of "may" is in direct contrast with the mandatory "shall," which is used elsewhere in the same provision: "adjudication fees . . . shall be deposited as offsetting receipts into a separate account entitled 'Immigration Examinations Fee Account' . . . ." Id. (emphasis added); see Poursina v. United States Citizenship & Immigr. Servs., 936 F.3d 868, 871 (9th Cir. 2019) (finding that jurisdiction was stripped in part because of the distinction between "shall" and "may"); N.J. Carpenters Health Fund v. NovaStar Mortg., Inc., 28 F.4th 357, 371 (2d Cir. 2022) ("The word 'shall,' in a statute, indicates a command; what follows the word 'shall' is 'mandatory, not precatory.'" (citation omitted)).

Having established that the word "may" clearly connotes discretion, the Court reviews the rest of the statutory provision to determine whether other language acts to cabin the discretion that "may" confers. It contains no such language. Rather, it contains additional flexible language, providing that fees "may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without

charge to asylum applicants or other immigrants." 8 U.S.C. § 1356(m) (emphasis added). To "ensure" means "to make sure, certain, or safe." Ensure, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/ensure (last visited August 25, 2026). In this context, the word "ensure" does not provide any limitations or further guidance on what USCIS "may" do. Had Congress intended to cabin USCIS's fee-setting authority in relation to its costs, it easily could have provided more specific statutory guidance that specified how USCIS should exercise its authority. Indeed, elsewhere in section 1356, Congress used such limiting language to set the separate "Immigration User Fee" and to create the "Immigration User Fee Account." See 8 U.S.C. § 1356(d) ("the Attorney General shall charge and collect $7 per individual for . . . [inspection and preinspection services]" (emphasis added)); id. § 1356(h)(1)(A) ("the Attorney General . . . shall . . . recommend any adjustment in the prescribed fee that may be required to ensure that the receipts collected from the fee charged for the succeeding two years equal, as closely as possible, the cost of providing these services") (emphases added)).[17] Section 1356(m) does not provide that USCIS "shall" set fees at a specific value. Nor does the statute provide that USCIS "shall" set fees to "ensure" that the fees "equal, as closely as possible" the costs.

Thus, section 1356(m) does not preclude USCIS from ensuring sufficiency by making provision for contingencies, nor does it place any limitation or cap on how to compute or set fees. See Paz v. Mayorkas, 767 F. Supp. 3d 368, 379 (E.D. Tex. 2025) ("§ 1356(m) lacks any

---

[17] The Immigration User Fee and Immigration User Fee Account were created in 1986 when Congress enacted the Immigration User Fee Statute, which "requires an entity issuing tickets to passengers traveling into the United States aboard commercial vessels or commercial aircraft to collect and remit a $7.00 'user' fee." Am. Airlines, Inc. v. United States, 77 Fed. Cl. 672, 674 (2007), aff'd, 551 F.3d 1294 (Fed. Cir. 2008). "The Immigration User Fee is used by the Department of Homeland Security to pay for inspection, detentions, and other expenses associated with the arrival of all passengers into the United States." Id.

discernable, statutory standards that would cabin discretion."); cf. Poursina, 936 F.3d at 871 (finding jurisdiction stripped in part because the statute provided that a waiver should issue only if the Attorney General "deems it to be in the national interest," which was not a "judicially manageable standard of review"); Perez Perez v. Wolf, 943 F.3d 853, 866 (9th Cir. 2019) (analyzing three statutes that section 1252(a)(2)(B)(ii) would apply to and noting that "none provide[ ] the Attorney General with statutory standards that constrain that action or decision").

In sum, the plain text of section 1356(m) vests USCIS with discretion to set the biometric fee and provides no further limitations on that discretion. Accordingly, section 1252(a)(2)(B)(ii) precludes judicial review.[18]

[18] Although the issue was not raised by Plaintiffs, the Court notes that this conclusion is consistent with the Supreme Court's decision in Kucana v. Holder, 558 U.S. 233, 247 (2010). There, the Supreme Court interpreted section 1252(a)(2)(B)(ii) by referencing section 1252(a)(2)(B)(i) and noting that statutes falling under subsection (ii) should be of a "like kind" to those falling under subsection (i). Id. As to statutes satisfying subsection (i), the Supreme Court noted that they all concern "substantive decisions . . . made by the Executive in the immigration context as a matter of grace, things that involve whether aliens can stay in the country or not." Id.

Setting aside the issue of whether Kucana is limited to the precise question before it (whether section 1252(a)(2)(B)(ii) applies when the Attorney General deemed a decision discretionary through regulation) and the fact that section 1252(a)(2)(B)(ii) explicitly applies "regardless of whether the judgment, decision, or action is made in removal proceedings," section 1356(m) is of a "like kind" with the enumerated statutes, all of which involve matters relating to permission to remain in the country. See iTech U.S., Inc. v. Renaud, 5 F.4th 59, 65-66 (D.C. Cir. 2021) (distinguishing Kucana on those two grounds). Because section 1356(m) sets fees for the processes that govern the very decision about whether an individual may stay in the United States or must leave, it is "inherently related" to those processes and decisions. See Paz, 767 F. Supp. 3d at 380. The administrative fee structure and the services it funds are elements of that decision-making process.

B. Plaintiffs' Arguments Are Meritless

In their opposition papers, Plaintiffs point to Nethagani v. Mukasey, in which the Second Circuit held that, "when a statute authorizes the Attorney General to make a determination, but lacks additional language specifically rendering that determination to be within his discretion (e.g., 'in the discretion of the Attorney General,' 'to the satisfaction of the Attorney General,' etc.), the decision is not one that is 'specified . . . to be in the discretion of the Attorney General' for purposes of § 1252(a)(2)(B)(ii)." 532 F.3d 150, 154 (2d Cir. 2008) (emphasis added). According to Plaintiffs, Nethagani establishes a "bright-line rule" for jurisdiction stripping under section 1252(a)(2)(B)(ii). (Pls. Mem. at 27.) Plaintiffs essentially seek to graft a "magic words" standard onto section 1252(a)(2)(B)(ii). (Id. at 28.) While certain words clearly invoke discretion—such as, "in the discretion of the Attorney General" and "to the satisfaction of the Attorney General"—those precise "magic words" are not required to strip the court of jurisdiction under section 1252(a)(2)(B)(ii). When the Nethagani Court listed illustrative types of language that would confer discretion, it explicitly indicated—by using the term "etc."—that the illustrations were not the exclusive formulations that could convey discretion. 532 F.2d. at 154 ("e.g., 'in the discretion of the Attorney General,' 'to the satisfaction of the Attorney General,' etc." (emphasis added)). Indeed, as explained supra pp. 17-20, section 1356(m) uses language that is inherently indicative of discretionary authority.

Bouarfa v. Mayorkas is illustrative of the flaws in Plaintiffs' reasoning. 604 U.S. 6 (2024). There, the Supreme Court held that judicial review jurisdiction was stripped by 8 U.S.C. section 1155, which vested the Secretary with discretion by using the words "may," "at any time," and "what he deems to be good and sufficient cause," id. at 10—none of which are phrases specifically listed in Nethagani. Similarly, in Kucana v. Holder, the Supreme Court

noted, albeit in dicta, that "asylum applicants might fall within section 1252(a)(2)(B)(ii)'s jurisdictional bar because a statutory provision, [8 U.S.C.] section 1158(b)(1)(A), specifies that 'the Attorney General *may* grant asylum.'" 558 U.S. 233, 246 n.13 (2010) (emphasis added in original). According to Kucana, "may," alone, could be sufficient to "suggest[] discretion." Id. (quoting Zadvydas v. Davis, 533 U.S. 678, 697 (2001)). Other courts have similarly rejected the notion of a canonical requirement that a statute must utilize the word "discretion" to be covered by the jurisdiction-stripping provision. See Flores v. Garland, 72 F.4th 85, 90 (5th Cir. 2023) (rejecting the argument that "§ 1252(a)(2)(B)(ii) requires a statute to include the magic word 'discretion' for the statute to specify that a decision or action is 'in the discretion of the Attorney General or the [Secretary]'"); Poursina, 936 F.3d at 873 ("Congress used a wide range of language to commit decisions to the government's discretion."); iTech US, Inc. v. Cuccinelli, 474 F. Supp. 3d 291, 295 (D.D.C. 2020) ("[M]agic words are not required to convey discretion."), aff'd sub nom. iTech U.S., Inc. v. Renaud, 5 F.4th 59 (D.C. Cir. 2021).

Next, Plaintiffs point to the fact that several courts have addressed challenges to section 1356(m) on the merits as an indicator of the existence of subject matter jurisdiction in the instant circumstances. See Immigrant Legal Res. Ctr., 491 F. Supp. 3d at 526; Nw. Immigrant Rts. Proj., 496 F. Supp. 3d at 41. The cited decisions are immaterial because none of those courts addressed the issue of subject matter jurisdiction under section 1252(a)(2)(B)(ii). Without subject matter jurisdiction, the Court is powerless to hear a case, even if other courts have entertained similar cases. United States v. Cotton, 535 U.S. 625, 630 (2002) ("[S]ubject-matter jurisdiction . . . involves a court's power to hear a case."). Subject matter jurisdiction "can never be forfeited or waived," id., and courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party," Arbaugh v.

Y&H Corp., 546 U.S. 500, 514 (2006). The silence of other courts on the issue does not establish that this Court has subject matter jurisdiction of Plaintiffs' challenge.

Lastly, Plaintiffs contend that section 1252(a)(2)(B)(ii) is "beside the point" because the issue is not "about ***how*** USCIS used its discretion under § 1356(m)," but rather "whether USCIS ***exceeded*** the discretion afforded to the Agency by statute." (Pls. Mem. at 26 n.7 (emphasis in original).) According to Plaintiffs, section 1356(m) does not vest USCIS with discretion to "set fees at a level that would exceed its projected costs." (Id. at 32.) Thus, in Plaintiffs' view, section 1252(a)(2)(B)(ii) does not apply where, as here, USCIS allegedly violated section 1356(m) "because it failed to allocate ***any*** costs to justify $10 out of $85." (Id. at 26 n.7 (emphasis in original); see also id. at 31-36 (arguing that USCIS violated section 1356(m)); Pls. Supp. at 2 (arguing "that USCIS exceeded its statutory authority—discretionary or not—to set fees under § 1356(m)").) In other words, Plaintiffs frame the issue as one regarding the scope of authority, or discretion, conferred by section 1356(m). Under Plaintiffs' view, the ultimate inquiry is whether section 1356(m) prohibits USCIS from setting "fees at a level that would exceed its projected costs." (Pls. Mem. at 32.) Nothing on the face of the statute, however, constrains USCIS to any specific formula to set the biometric services fee. Rather, as explained supra pp. 17-20, section 1356(m) confers discretion on USCIS in setting the biometric services fee.

C. The Only Other Court to Consider This Issue is in Accord

The issue before the Court appears to be one of first impression in this Circuit and to courts in most of the country. To the best of the Court's knowledge, only one other court has ever addressed this issue. Paz v. Mayorkas, 767 F. Supp. 3d 368 (E.D. Tex. 2025). Like Plaintiffs here, the plaintiffs in Paz challenged the biometric services fee charged by USCIS, and

the government similarly raised section 1252(a)(2)(B)(ii) as a defense. On the government's motion to dismiss, the Paz court held that section 1356(m) "is clearly a discretion-conferring provision" such that section 1252(a)(2)(B)(ii) "strip[ped] [the court] of jurisdiction to hear th[e] case." Id. at 383. The Paz court relied, inter alia, on the fact that section 1356(m) "uses the word 'may' twice, and this word is understood to have a discretionary import," id. at 378-79, and the fact that "section 1356(m) lacks any discernable statutory standards that would cabin discretion," id. at 379 (citing Perez Perez, 943 F.3d at 866; Bouarfa, 604 U.S. at 14). That reasoning applies here, for the reasons discussed supra pp. 17-20.

## III. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the complaint under Rule 12(b)(1) for lack of subject matter jurisdiction is granted. In light of this determination, the Court need not, and cannot properly, address the standing and merits prongs of Defendant's motion practice. The motion of the amici is likewise denied as moot. This Memorandum Opinion and Order resolves docket entry nos. 43 and 59. The Clerk of Court is respectfully directed to enter judgment dismissing the complaint in its entirety and close this case.

SO ORDERED.

Dated: New York, New York
September 1, 2026

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge